[Civil No. 3596. Filed March 30, 1936.]

[56 Pac. (2d) 639.]

C. F. PERKINS and L. E. PERKINS, His Wife, Appellants, and C. E. PERKINS and MARY L. PERKINS, His Wife, Appellants, v. FIRST NATIONAL BANK OF HOLBROOK, Arizona, a Corporation, Appellee.

Mr. Thorwald Larson, for Appellants C. F. and L. E. Perkins.

Messrs. Favour & Baker and Mr. A. M. Crawford, for Appellants C. E. and Mary L. Perkins.

Mr. Sidney Sapp and Mr. Guy Axline, for Appellee.

ROSS, J.—The First National Bank of Holbrook, on January 18, 1933, commenced this action against Cephas (C. F.) Perkins and Louise (L. E.) Perkins, his wife, and Charles (C. E.) Perkins on two past-due promissory notes of Cephas and Louise, one for $2,500 and the other for $1,000, and to foreclose a realty mortgage executed by Cephas and Louise on a number of lots in Perkins addition to the townsite of Holbrook, Navajo county, and 2,480 acres of range land in said county, and a chattel mortgage executed by Cephas and Charles on all cattle branded CP on left hip and all cattle branded TD on left hip, approximately 150 head, together with the increase, ranging at the mouth of Leroux wash in Navajo county; said mortgages being security to the notes.

Cephas and Louise filed an answer setting up that prior to the commencement of the action, on, to wit, January 5, 1933, Cephas had filed his petition of voluntary bankruptcy in the United States District Court for Arizona; that he was adjudicated a bankrupt on January 9, 1933; and that the state court was without jurisdiction to proceed.

Mary L. Perkins is the wife of Charles Perkins. She, her husband joining her, intervened, claiming that the cattle covered by the chattel mortgage were the community property of herself and Charles; that she did not sign the notes or the chattel mortgage; that the debt evidenced thereby was not a community debt of herself and husband; and that the community received no benefit therefrom, but that said notes were the obligation of Cephas and Louise Perkins, and that her husband, Charles, signed the chattel mortgage only as surety.

The plea to the court's jurisdiction was overruled, and thereafter, in April, 1934, the parties waiving a jury, the case was tried to the court, resulting in a

judgment for the plaintiff for the full amount of the notes, interest, costs and attorneys' fees. The mortgages were foreclosed and the mortgaged property was ordered sold, and, if an insufficient amount to pay the judgment was realized, that judgment be entered against Louise Perkins for such deficiency.

The defendants and interveners have appealed. Cephas and Louise prosecute one appeal, and Charles and Mary another.

Cephas Perkins and wife made no defense to the merits but stood upon their plea to the jurisdiction of the court. They now insist that the suit should have been abated for want of jurisdiction.

Interveners also assign the court's ruling on the plea in abatement as error, and in addition contend that the court erred in foreclosing the chattel mortgage on the cattle, claiming that the cattle were the community property of the interveners and could not be mortgaged by the husband alone.

It appears that Cephas Perkins filed his petition in voluntary bankruptcy and listed as his sole creditor the plaintiff, First National Bank of Holbrook; that he gave as his only liability the sum of $3,500 owing to plaintiff, secured by the mortgages here being foreclosed; that thereafter, on January 9th, he was adjudicated a bankrupt; that on January 18th plaintiff instituted this action of foreclosure; that the bankruptcy court appointed a trustee in bankruptcy and the trustee petitioned the court to authorize and permit him to abandon any claim to the "said real estate on account of mortgage liens, tax liens, and exemptions against the same"; whereupon, on March 31, 1933, an order was entered by the bankruptcy court granting the petition and directing the trustee to abandon the mortgaged property. On such showing, the superior court refused to dismiss the fore-

closure proceeding and in April, 1934, long after the trustee had abandoned the property, proceeded with the trial and to judgment.

The question as to whether the superior court should have abated the action was presented to this court by Cephas and Louise Perkins, by *certiorari*, on the 21st day of November, 1933, and it appearing that the bankruptcy court had abandoned the mortgaged property, we held (without a written opinion) that the superior court properly retained jurisdiction of the action and on January 22, 1934, dismissed the petition. The Supreme Court of the United States refused to review our action, as shown by its order of April 30, 1934, filed in this court on May 7, 1934.

It is contended by the appellants that the ruling on *certiorari* is contrary to the holding of the Supreme Court in *Isaacs v. Hobbs Tie & Timber Co.,* 282 U. S. 734, 51 Sup. Ct. 270, 75 L. Ed. 645, and similar case. In the Isaacs case the mortgagee brought his action to foreclose after the debtor had been adjudicated a bankrupt, just as in this case, but the trustee in bankruptcy insisted that all of the assets of the bankrupt, including those assets with valid and subsisting liens against them, were in bankruptcy court and that the mortgagee's remedy was to submit to the court first taking jurisdiction. The Supreme Court sustained this position of the trustee, saying (282 U. S. 734, 51 Sup. Ct. 270, 272, 75 L. Ed. 645, at page 665):

"This is but an application of the well-recognized rule that, when a court of competent jurisdiction takes possession of property through its officers, this withdraws the property from the jurisdiction of all other courts which, though of concurrent jurisdiction, may not disturb that possession; and that the court originally acquiring jurisdiction is competent to hear

and determine all questions respecting title, possession, and control of the property.''

And later, 282 U. S. 734, 51 Sup. Ct. 270, 272, 75 L. Ed. 645, at page 670, it said:

''That the court in which foreclosure proceedings are instituted is without jurisdiction, after adjudication of bankruptcy, to deal with the land or liens upon it *save by consent of the bankruptcy court.''* (Italics ours.)

■ · It is well settled that the trustee ''may refuse to take possession of the property where it is so encumbered that there is not sufficient equity to justify administration thereon (*Re Hasie,* [D. C. 1913] 206 Fed. 789, 30 A. B. R. 83), and it is his duty to do so (*Re Rogers Brown & Co.,* [1912] 116 C. C. A. 386, 196 Fed. 758, 28 A. B. R. 336; *Re Zehner,* [D. C. 1912] 193 Fed. 787, 27 A. B. R. 536).''

From note 2, at page 654, of 75 L. Ed., Isaacs case, *supra.*

■■ Since there is no claim or suggestion that the mortgaged property was worth more than the mortgage and tax liens and exemptions, we must conclude the action of the trustee in abandoning the property was properly confirmed by the bankruptcy court and that such action was tantamount to consent of the bankruptcy court that the mortgagee might proceed to foreclose in the state court. The bankruptcy court refusing to go ahead and administer the debtor's estate, the mortgagee had no forum open to it unless it could foreclose in the state court. If appellant is right, the doors of the courts were barred against the mortgagee bank. It is said in 7 Corpus Juris 349, section 615:

''The filing of a petition in bankruptcy does not prevent the commencement of an action against the bankrupt, although it is subject to be stayed.''

This statement, we think, is in conformity with a general rule of procedure. In *Servall `Automotive Service* v. *McDuffie,* 44 Ariz. 498, 38 Pac. (2d) 655, this court held that an adjudication in bankruptcy did not deprive the state court of its jurisdiction over the person of the bankrupt or the subject-matter, and that while the court could not enforce a judgment against the bankrupt, it could ascertain the amount of the indebtedness and enter judgment therefor.

■ Just why Cephas Perkins went into bankruptcy when he had but one creditor, whose debt was secured by mortgages on all of his assets except exemptions, is not clear, unless he wanted to prevent any deficiency judgment being taken against him in case the mortgaged property proved insufficient to pay his debts in full. At all events, there was no creditor except the plaintiff bank for the bankruptcy court to protect and, since the bank's security could be foreclosed without the expense of administration by the bankruptcy court, the only reasonable and natural thing to do was to leave the matter in the state courts.

■ Cephas and Louise Perkins complain because the court denied their motion for a continuance of the case for a period of two years on account of an "emergency"; the motion being based upon the provisions of chapter 29, Laws 1933. Granting, for the purposes of this case, that chapter 29 is valid, it provides that if "good cause is shown" why there should not be a continuance the court may refuse to grant it. The showing that Cephas Perkins had voluntarily gone into bankruptcy was certainly *good cause* for leaving the action to foreclose mortgages on the trial calendar of the superior court without an order of continuance. The bankrupt in the bankruptcy court was asking that his estate be liquidated and his creditor's claim be discharged, and in the state court

resisting a proceeding that had for its object the accomplishment of the same purpose, to wit, the liquidation and satisfaction of plaintiff's claim. Under the facts the court properly exercised its discretion in refusing the request for continuance.

■ Another complaint is that the court authorized a deficiency judgment be entered against Louise Perkins. The notes involved were the debt of Cephas and Louise, his wife. Cephas having gone through bankruptcy, nothing beyond the mortgages could be collected from him. Not so Louise. She had not paid her debts through bankruptcy. The debts having been incurred prior to the adoption of the so-called deficiency judgment law, found in chapter 88, Laws 1933, and such law being prospective and not retrospective under our holding in *Kresos* v. *White, ante,* p. 175, 54 Pac. (2d) 800, the deficiency judgment was properly entered against Louise.

We have carefully examined all of the other assignments of error made by Cephas and Louise Perkins and find that they are without merit.

■ Interveners reduce their second assignment to this proposition of law: That Charles Perkins, as a member of the community, had no power under the law without the knowledge and consent of his wife, Mary L. Perkins, to use the community assets to guarantee the debt of a stranger to the community; it deriving no benefit therefrom. This proposition is confirmatory of what is settled law in this jurisdiction. Section 2175, Revised Code of 1928, makes the community property liable for the community debts contracted by the husband. And in *Cosper* v. *Valley Bank,* 28 Ariz. 373, 237 Pac. 175, we held the community was not liable for a debt contracted by the husband in no way connected with the community and from which the community received no benefit. This

would protect the community from a liability of the husband as surety or guarantor, unless it was in aid of, or for, the community. *Sun Life Assur. Co.* v. *Outler,* 172 Wash. 540, 20 Pac. (2d) 1110.

■ If the facts upon which the above proposition of law is based are not supported by the evidence, it fails. The court made no findings of fact. In such case, unless it is made to appear that the evidence does not support the judgment, our duty is to affirm, providing the judgment is within the issues made by the pleadings.

■ We start with the presumption that the judgment foreclosing the chattel mortgage on cattle is supported by the evidence; that either the mortgaged chattels were not the community property of Charles and Mary Perkins, or, if they were, that the debt the mortgage was given to secure was a community debt. If the evidence as to whose property the cattle were —Cephas' or Charles'—is in conflict, or if it tends to show the debt secured was for the benefit of the community, its weight was for the determination of the trial court, whose decision thereon should not be disturbed.

Interveners claim that the evidence shows that the mortgaged cattle were their property and that the debt they were mortgaged to secure was the debt of Cephas Perkins. The appellee, on the other hand, claims the cattle at all times belonged to Cephas and that the title set up by Charles is only colorable and for the purpose of defrauding appellee. The true ownership of the cattle was made an issue in the pleadings and much of the evidence was directed to that issue.

The Perkins men are brothers. Prior to the transactions giving rise to this litigation, and for many years, Cephas was engaged in the cattle raising busi-

ness in Navajo county; his recorded brands being the TD and CP. Charles was a civil engineer and as such lived in many places, in and out of Arizona, in practicing his profession. In 1920 Charles and his wife began living apart much or most of the time; she taking up her residence in California, and he continuing to reside in different places, as his business required.

In 1925 Cephas was indebted to plaintiff in the sum of $2,000, evidenced by an unsecured note. Upon the request of plaintiff, he and his wife executed to the plaintiff a mortgage upon certain of their realty to secure the payment of this note. In November, 1930, Cephas owed to the First National Bank of Winslow the sum of $1,500, secured by a mortgage signed by Cephas and Charles on the CP and TD cattle. At that time the notes here sued on were made to the plaintiff for the purpose of taking up the $2,000 note to plaintiff and to secure $1,500 more, making the $3,500 here involved.

The evidence is in conflict, but tends to show that $1,500 of this sum was used to pay off the Winslow bank and to secure a release of its mortgage against the cattle.

On March 30, 1926, and not very long after the $2,000 realty mortgage was given to the plaintiff, Cephas gave a bill of sale of the CP and TD brands to one P. E. Gillespie, which was recorded about one year thereafter. Gillespie is a brother of Cephas Perkins' wife, Louise. According to the evidence, the consideration for this bill of sale was a small cash payment, the amount Cephas was not able to state, and Gillespie's unsecured note for an amount he was not able to state. There was no delivery of the cattle to Gillespie. Their possession and control remained

with Cephas, and on his regular range except as hereinafter noted.

On November 18, 1927, Gillespie gave a bill of sale of said cattle to Charles Perkins, and it is under this instrument that Charles and his wife, Mary, claim the cattle as theirs. This transfer was made under the direction of Cephas. Charles and Mary did not know of it until some time afterward. They paid Gillespie nothing whatever. The brothers, however, testified, as did Mary, that during the years from April, 1914, up to November, 1927, Charles had loaned, from time to time, over $10,000 to Cephas, which was the consideration for the bill of sale from Gillespie to Charles. Cephas' explanation of this transaction was that the sale to Gillespie fell through owing to changed plans and that, instead of having title transferred back to himself, he had the bill of sale made direct to Charles. The $10,000 said to be owing to Charles is an estimated sum, as the brothers kept no books, had no canceled checks, no letters, no memoranda, nor any evidence whatever of such debt except the verbal statements of the brothers and Mary. The possession, control and management of the cattle remained in Cephas through all these transactions. He marked and branded the increase and sold and disposed of the cattle as he pleased. Cephas testified, in substance (as reduced to narrative form by appellee):

"The cattle, so long as they remained in specie and in my possession, belonged to my brother, as his agent. I took care of them for him. When I sold any cattle of any age or kind bearing CP and TD brand and got the cash for them the cash belonged to me. Before the cattle were sold, so long as they remained in specie they belonged to my brother."

Cephas at no time rendered any account of the cattle or of the increase to Charles or Mary, although

he sold and disposed of them as he pleased. During the pendency of this action, Cephas admits he branded, and caused to be branded, some sixty head of CP and TD cattle and their increase with a brand called the ''Plow Handle,'' which was not recorded as required by law. On some of these cattle the CP and TD brands were barred or burned out. The cattle bearing the Plow Handle brand were removed some fifty miles from their accustomed range. The care and enjoyment of the cattle were Cephas'; the empty credit of posing as the record owner was Charles'.

It seems these circumstances were sufficient to justify the court in believing the CP and TD cattle were in fact all the time the property of Cephas, and not the property of Charles and Mary. Such a finding we think the evidence supports.

Interveners make the point, however, that the bank, having accepted the chattel mortgage on the cattle reciting that Charles Perkins was the owner and mortgagor, is estopped to deny his title. If the facts showed that the bank was now relying upon Charles' title to the cattle, the rule invoked might be applicable; but the bank does not rely on Charles' title. It insists that the rightful owner of the cattle all the time was Cephas, and that the record transfer of the title to the cattle to Charles was for the purpose of defrauding the bank.

The judgment is affirmed.

LOCKWOOD, C. J., and McALISTER, J., concur.